IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

FILED
03 MAR 13 PM 4:03
U.S. DISTRICT COURT
N.D. OF ALABAMA

| | | |
|---|---|---|
| JUAN AQUAS ROMERO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| DRUMMOND COMPANY, INC., | ) | CV-03-BE-0575-W |
| DRUMMOND LTD, | ) | |
| GARRY N. DRUMMOND, and | ) | |
| AUGUSTO JIMENEZ, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

# COMPLAINT

## I. NATURE OF THE ACTION

1. Plaintiff Juan Aquas Romero (hereinafter Aquas) is a union official of Plaintiff SINTRAMIENERGETICA, and is employed by Defendants Drummond Company, Inc., Drummond Ltd., Garry N. Drummond and Augusto Jimenez (collectively referred to as "Defendants") brings this action for equitable relief and damages. He was acting on behalf of SINTRAMIENERGETICA and represented the workers at Defendant Drummond Company's subsidiary, Drummond, Ltd., when he was subjected to torture, including regular and credible threats of death made by agents or employees of Defendants.

2. This case involves the systematic intimidation, torture, and murder of trade unionists in Colombia, South America at the hands of paramilitaries working as agents of Defendants. The violent persecution of trade unionists in Colombia has been at epidemic proportions for many years. Since 1986 when the Central Unitaria de Trabajadores de Colombia ("CUT"), the largest trade union confederation in Colombia, was formed, over 4,000 trade unionists have been murdered. Presently,

of every five (5) trade unionists murdered in the world, over three (3) are Colombian. This case is brought under the Alien Tort Claims Act (ATCA), Torture Victim Protection Act (TVPA) and state tort law, and seeks to remedy and prevent the violent persecution of trade unionists working at the Drummond Company facilities in Colombia. These include the coal mine in Valledupar, Colombia, the rail line connecting the coal mine to the port near Santa Marta, Colombia, and Puerto Drummond, the company-owned port used to load coal on shipping barges. The Drummond Companies are knowingly engaged in an ongoing campaign of terror against trade unionists in Colombia.

3. With respect to their business operations in Colombia, the Defendant companies have hired, contracted with or otherwise directed paramilitary security forces that utilized extreme violence and murdered, tortured, unlawfully detained or otherwise silenced trade union leaders of unions representing workers at Defendants' facilities. The torture that Plaintiff Aquas was subjected to followed the murders of three of his close colleagues in SINTRAMIENERGETICA, Valmore Locarno Rodriquez, Victor Hugo Orcasita Amaya, and Gustavo Soler Mora, all of whom were murdered in 2001 by paramilitary agents working for Defendants in a campaign to eliminate effective leaders of the trade union representing Drummond workers, and to intimidate other workers from joining the union or assuming a union leadership position. The torture of Plaintiff Aquas is in violation of the Alien Tort Claims Act (ATCA), 28 U.S.C. §1350, the Torture Victims Protection Act (TVPA), international human rights law, and the common tort law of the state of Alabama.

4. Plaintiff Aquas does not have access to an independent or functioning legal system within Colombia to raise their complaints. Any effort by Aquas to seek legal redress would be futile because those seeking to challenge official or paramilitary violence, including prosecutors and

prominent human rights activists, are at great risk from retaliation. Plaintiff Aquas has made an effort to use the legal process in Colombia, but he was told that the government could not protect him if he continued to serve as a union leader at the Drummond facilities, so he was offered the opportunity to go into hiding as an "internally displaced person." The government of Colombia has made no effort to prosecute any officials of Drummond Defendants, nor has it made any effort to prosecute the paramilitary agents for the Drummond Defendants. The sole recourse available to Plaintiff Aquas in Colombia is to remain in hiding, while his torturers remain free and open for business. The persecution suffered by Plaintiff Aquas is common for trade union leaders in Colombia, and has been well-documented in credible human rights reports by the U.S. Department of State, Human Rights Watch and Amnesty International.

5. The Colombian judicial system is generally regarded as corrupt and unable to respond to the violence against trade union leaders or other human rights activists. Plaintiff Aquas' case is typical. There is no effort made to prosecute those who are using violence to target trade union leaders, and the government has essentially surrendered its role as enforcer of the law by conceding that the only remedy available to persecuted trade union leaders is to go into hiding. The few extraordinary government officials in Colombia who do try to use legal means to prosecute paramilitaries are themselves threatened with death, and in many cases, are assassinated if they too fail to go into hiding.

6. Plaintiff Aquas, prior to going into hiding, was aware that his close colleagues in SINTRAMIENERGETICA, Valmore Locarno Rodriquez, Victor Hugo Orcasita Amaya, and Gustavo Soler Mora were murdered even though they had sought the assistance and protection of Colombia's Minister of the Interior. No effective action was taken to protect them, and there effort

to use the Colombian legal system proved futile in the most extreme sense.

7. The justice system in Colombia has failed utterly to bring the perpetrators of anti-union violence to justice under the laws of Colombia. Indeed, out of the thousands of cases of trade union assassination which have taken place since 1986, only a handful of cases have been successfully prosecuted. Moreover, even if there were remedies available to Aquas in Colombia, such remedies are inadequate and would not afford the complete relief available to Aquas by this Complaint. Defendants, because they do business in Colombia, are well aware of these conditions, and know that Aquas do not have the option of seeking justice in Colombia for human rights violations that target trade unionists.

## II. JURISDICTION AND VENUE

8. This Court has federal question jurisdiction pursuant to 28 U.S.C. §1331, based on the ATCA and the TVPA, 28 U.S.C. §1350, for the alleged violations of international human rights law. Supplemental jurisdiction exists over the state law causes of action pursuant to 28 U.S.C. § 1367.

9. Venue properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b) and (c).

## III. PARTIES

### Plaintiff

10. Plaintiff Aquas is a citizen and resident of Colombia and is a local Union officer at Drummond Company's wholly owned subsidiary, Drummond Ltd. He is currently in hiding within Colombia following systematic and credible death threats made by paramilitary employees and/or agents for Defendants.

**Defendants**

11. Defendant Drummond Company, Inc. is a for-profit corporation incorporated in Alabama that is engaged primarily in the mining and shipment of coal. It is a closely-held corporation owned by the Drummond family, and is controlled in its day-to-day operations by Defendant Garry N. Drummond. Its principal place of business is located at 530 Beacon Parkway, Suite 900, Birmingham, Alabama 35209. Among other places, Drummond Company, Inc. owns and operates a large coal mine, rail line and port in Colombia, South America. The operations in Colombia are financed and managed from the Alabama headquarters of Drummond Company, Inc, and the profits from the Colombia operations revert to Drummond Company, Inc.

12. Defendant Drummond Ltd. is an Alabama company, incorporated in Jasper, Alabama, and has its principle place of business at 3000 Highway 78, Jasper, Alabama 35501. It is wholly-owned by Drummond Company, Inc. Drummond Ltd. manages the day-to-day operations of the Drummond coal operations in Colombia, but is at all times operating under the complete ownership, direction and control of Defendant Drummond Company, Inc, and Defendant Garry N. Drummond. Drummond Ltd. lists Drummond Company, Inc. as its Chief Executive. Fully aware of the violence in Colombia, particularly anti-union violence, and the absolute impunity afforded the perpetrators of such violence in Colombia, Drummond Company, Inc. created Drummond Ltd. for the sole purpose of operating the Colombian mines for the sole benefit of Drummond Company, Inc. while also attempting to shield Drummond Company, Inc. from liability for any and all tortious conduct committed by the management of these mines. The creation of Drummond Ltd. was a sham done for the aforesaid unlawful purpose.

13. Defendant Garry N. Drummond is the Chief Executive Officer and Chief Operating Officer of Defendant Drummond Company, Inc. Defendant Garry N. Drummond is active in Drummond's operations in Colombia, and personally deals with issues relating to collective bargaining negotiations and relations with paramilitary forces used by the company.

14. Defendant Drummond Company, Inc. is a closely-held corporation, owned and controlled by Defendant Garry Drummond and other members of his family. Defendant Garry Drummond makes all of the day-to-day decisions regarding the operation of Defendant Drummond Company, Inc. and profits from the company's operations in Colombia are transferred to one or more bank accounts held by Defendant Drummond Company, Inc. and/or Defendant Garry Drummond in Alabama. Purely to serve as an instrumentality for Defendant Drummond Company, Inc to operate the company's coal mine and related facilities in Colombia, Defendant Garry Drummond caused Defendant Drummond Company, Inc. to create Defendant Drummond Ltd., which is a wholly-owned, undercapitalized alter ego of Defendant Drummond Company, Inc. totally under the dominance and control of Defendant Drummond Company, Inc. and Defendant Garry Drummond.

15. Defendant Garry Drummond makes decisions relating to the Colombia operations in Alabama, and then either personally implements them or orders others employed by Defendant Drummond Company, Inc. and/or Defendant Drummond Ltd. to implement them in Colombia. Defendant Garry Drummond's complete control over and ownership of Defendant Drummond Company, Inc. and Defendant Drummond Ltd. makes these companies his alter ego.

16. Defendant Augusto Jimenez is a Colombian national who is the President of the Drummond mining operations in Colombia, and manages most aspects of the operation. He now resides in Alabama, which is his legal domicile. He spends significant portions of his time at the

Drummond facilities in Alabama to consult with Defendant Gary Drummond, participate in making decisions with Garry Drummond, and to then be responsible for implementing those decisions in Colombia through local staff. Defendant Jimenez has sufficient contacts with this judicial district.

17. Defendant Drummond Company, Inc. is jointly and severally liable for all of the tortious actions committed when its alter ego and/or agent, Drummond Ltd., acts in concert with any other person or entity in furtherance of Drummond Company, Inc.'s business interests and activities. All of the wrongful acts alleged herein were committed by paramilitary forces hired by or retained by employees or agents of Drummond Company, Inc. or Drummond Ltd., making Drummond Company, Inc. directly or vicariously liable for all of the wrongful acts. Likewise, since both companies are alter egos of Garry Drummond, he is vicariously liable for the acts of employees or agents of his alter ego companies. He is also liable for the conduct of the paramilitaries at issue in this case because he was made aware by the Union prior to the torture of Plaintiff Aquas, specifically through the murders of Locarno, Orcasita and Soler, that Drummond Ltd. had hired known paramilitaries as security at the La Loma mines, and that these paramilitaries were threatening the lives of the leaders of the Union. Defendant Garry Drummond was further asked by the Union to deal with this situation in the interest of protecting the lives of the workers and trade unionists at the La Loma mines, and yet, in reckless disregard for these lives, failed to stop Drummond Ltd. from retaining such paramilitary forces.

18. The paramilitary forces that tortured Plaintiff Aquas were acting within the course and scope of a business relationship with Defendants with the advance knowledge, direction, acquiescence or subsequent ratification of Defendants.

## IV. BACKGROUND FACTS CONCERNING VIOLENCE AGAINST TRADE UNION LEADERS AND MEMBERS IN COLOMBIA.

19. Colombia is widely known as a country that is torn by a long-standing civil war involving armed leftist groups on the one side, and the Colombian military as well as right-wing paramilitaries on the other. It is universally acknowledged that the regular military in Colombia, and the civil government authorities, tolerate the paramilitaries, allow them to operate, and often cooperate, protect and/or work in concert with them.

20. The extent of the civil conflict is so pervasive that the country's civil war necessarily must be governed by the rules of war so that the combatants, the right-wing paramilitaries, the leftist guerillas, and the regular military are governed by Article 3 of the Geneva Convention which applies to "an armed conflict not of an international character." Thus, noncombatants to the Colombian civil war, including Mr. Aquas, standing in the place of the deceased, are protected from human rights violations and other war crimes committed by any parties to the conflict, regardless of whether the combatant parties are formally recognized as government officials. This includes the paramilitary forces which clearly are major participants in the civil conflict.

21. The paramilitaries in Colombia, including those directly involved in the wrongful acts alleged herein, were created based on official sanction of the Government of Colombia. Under "Law 48," passed in 1968, the Defense Ministry was authorized to create and provide weapons to civil patrols. It is by this authorization that most of the paramilitaries were created and sustained in Colombia. Such paramilitary groups continue to thrive under official sanction, often with the ongoing cooperation with and/or participation from the Colombian military.

22. The paramilitaries in Colombia have a mutually-beneficial, symbiotic relationship

with the Colombia government's military. According to a recent report by Human Rights Watch, the relevant facts of which Aquas incorporates herein by reference, 78% of the murders in Colombia from October 1999 to March 2000 were attributable to the paramilitaries. ***The Ties that Bind: Colombia and Military-Paramilitary Links***, Human Rights Watch (February, 2000), at 2. The Human Rights Watch investigators found "detailed, abundant, and compelling evidence of continuing close ties between the Colombian Army and paramilitary groups responsible for gross human rights violations." *Id.* at 1. The facts supporting the ongoing symbiotic relationship between the military and paramilitaries in Colombia include that active and retired military actually set up paramilitary units, the military provides the paramilitaries with weapons, intelligence, and supplies, and the paramilitaries conduct missions at the request of the military. *Id.* at 2-3.

23. The close, symbiotic relationship between the military and paramilitaries in Colombia is so widely acknowledged that even the U.S. State Department's ***Country Reports on Human Rights Practices -- Colombia*** (February 2001) at 5 confirms this fact without reservation. In the specific case of Drummond, paramilitaries are openly encamped on the Drummond property alongside regular military, and there is cooperation between them in their day to day activities. Moreover, recent official condemnation of paramilitaries by the Government of Colombia has not altered the symbiotic relationship between the regular military and paramilitary soldiers encamped on the Drummond property to provide security "services."

24. In ***Country Reports on Human Rights Practices -- Colombia*** (March, 2002), the U.S. State Department, which recently designated the chief and largest paramilitary group (the AUC) as a "terrorist" group, concluded that "in some locations elements of the state security forces tolerated or even collaborated with paramilitary forces." For a number of years, the location in which

Defendants operate in Colombia, the Cesar Province, has been one of these locations where the collaboration between the state security forces and the paramilitary forces is especially keen. In the specific case of the Drummond facilities in Colombia, this collaboration is confirmed by the open relationship of the military and paramilitary forces sharing space on the Drummond property, and neither the regular military nor the police have taken any action to stop the violent practices of the paramilitaries openly operating on Drummond's property in Colombia.

25. The close, symbiotic relationship between the military and paramilitaries working on the Drummond property in Colombia is such that the paramilitaries are acting under color of the authority of the government of Colombia. Wholly part from any new official position of the Government of Colombia in Bogota, the paramilitaries working for Drummond, including those who committed the wrongful acts alleged herein, act with support from and cooperation with the official military, also encamped on the Drummond property.

26. In order to have plausible deniability, the Government of Colombia does not officially sanction the murders and other human rights violations committed by the paramilitaries. However, there have been few successful prosecutions of paramilitaries because the Government of Colombia knowingly permits the paramilitaries to operate and to carry out assignments for the formal military.

27. The paramilitaries in Colombia are particularly well-known for murdering, abducting and torturing trade union leaders who they view as being subversives. The paramilitaries' characterization of trade unionists as subversives is in accord with the view of the Colombian government which, in Decree 180, has designated trade union leaders as "terrorists." As a result, in the words of the International Confederation of Free Trade Union's in their 2002

Report ("ICFTU Report"), Colombia is "the most dangerous place in the world to be a trade union activist." (ICFTU Report at p. 73). And, as the ICFTU notes, these trade unionists are being murdered by very virtue of the fact that they are trade unionists -- that is, they are not merely being caught in the cross-fires of the armed conflict in Colombia; they are targets, particularly of the paramilitaries which are "hostile towards the unions." (*Id.* at 74). The Colombian Minister of Labor himself, in testimony to the International Labor Organization ("ILO"), characterized the murder of trade unionists in Colombia as "genocide." (ILO 2002 Report at Part 2/23).

28. The specific violence against trade union leaders alleged in this case is typical of the targeting of trade union leaders for violence in the Cesar Province -- the area in which the acts described herein took place. In a recent report, Amnesty International explains that "[t]he systematic violation of human rights against members of popular organizations . . . in the department of Cesar corresponds to a national strategy of undermining organizations which the [state] security forces deem to be subversive." (AI Report at p. 3). Amnesty International further finds that "[m]any violations of human rights in the [Cesar] region are committed in order to advance and protect the interests of economically powerful sectors. Labeling anyone who dares to challenge the interests of powerful economic sectors as subversive . . . and then targeting them for human rights violations provides a means for those sectors to protect their interests." (*Id.*).

29. The paramilitaries' targeting of thousands of individuals for assassination, including Plaintiff Aquas, simply because of their status as trade unionists, constitutes genocide and a war crime. The paramilitaries are able to torture and execute trade unionists with impunity, including Plaintiff Aquas, because of the lawless environment in Colombia created by the ongoing civil conflict.

30. As a consequence of the official vilification of trade unionists by the Colombian government, which serves as an open invitation to paramilitaries to target trade union leaders with violence, Colombia has led the world in the number of murders of trade unionists for the past 10 years. More than 160 trade union leaders were killed in 2001, 128 were killed in the year 2000, and in the last 10 years, over 1,500 have been murdered. A much larger number have been subjected to torture, including regular threats of death, unlawful detention, and kidnapping.

31. In addition to the referenced reports by Human Rights Watch and the U.S. State Department, there is comprehensive public reporting on the systematic human rights violations occurring in Colombia by the paramilitaries, as well as on the specific targeting for murder and other human rights violations of trade union leaders and members. Major print and television media in the U.S. have reported on the violence in Colombia targeting trade union leaders. In addition, international organizations, including Amnesty International, the International Labor Organization, and the United Nations Commission on Human Rights have all reported extensively on paramilitary violence against trade union leaders in Colombia.

32. At the time of the events alleged herein, Defendants knew, or were substantially certain, that they were doing business in an environment in Colombia where their workers who were members of trade unions were at great risk of being murdered, tortured, kidnapped or unlawfully detained by paramilitaries. As more fully explained below, the Defendant Companies took advantage of the fact that paramilitaries target trade unionists in Colombia to prevail upon these paramilitaries to commit violent acts against the employees at the Drummond facilities who held leadership positions in the union. Defendants knew that, because of the lawless environment created by the civil conflict in Colombia, the paramilitaries acting as their agents could torture and even

murder trade unionists employed at their mines -- including Plaintiff Aquas – with impunity. The ICFTU, in its 2002 report, noted with alarm that "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001." (ICFTU Report at p. 81).

## V. SPECIFIC EVENTS LEADING TO THE TORTURE OF PLAINTIFF AQUAS

33. Defendants Drummond Company, Inc. and Drummond Ltd. utilize the services of the Colombian military to protect its mining facilities, railway lines and U.S. workers in Colombia. Drummond Company, Inc. and/or Drummond Ltd. actually support a military base on company property by providing the land, as well as electricity, fuel, and equipment. The Defendant companies also maintain the local roads used by the military. Defendants do so with specific knowledge that some of the local military supported by the company cooperate with the paramilitaries that also operate on the Drummond property and act on behalf of Drummond. Further, a significant number of these military personnel also are members of the paramilitaries operating in Valledupar, Colombia and elsewhere.

34. In addition, Drummond Company, Inc. and Drummond Ltd. permit known paramilitaries of the United Self-Defense Forces of Colombia ("AUC") to freely enter their mining facilities in Colombia. These AUC paramilitaries are permitted to operate openly in and around the Drummond facilities in Colombia because they are in a cooperative and symbiotic relationship with the regular military that are stationed on Drummond's property. Further, some of the regular military soldiers based on Drummond's property also are members of the AUC paramilitaries operating in

and around the Drummond facilities. Pedro Maya, a Human Resources Manager for Drummond at the La Loma mines, has regular contacts and meetings with the AUC. Likewise, Alfredo Araujo, a community relations manager for Drummond in La Loma, openly associates with paramilitaries, and coordinates their activities in the La Loma area. The Defendant companies provide supplies, including fuel, as well as monetary support to these paramilitaries. The Defendant companies pay the paramilitaries out of a slush fund account which is controlled in Colombia by La Loma mines' President Augusto Jimenez. The Defendant companies transfer monies from Alabama into this Colombian account under the pretext of paying wages to their U.S. employees in Colombia. However, in fact, the Defendant companies actually remunerate their U.S. employees by paying monies into their individual accounts in the United States.

35. Drummond's decision to employ paramilitaries to terrorize the trade union leaders employed by the company began with a meeting held in 1997 at the company headquarters in Birmingham, Alabama. This was following the July 22, 1996 formation of a union at the company's facilities in Colombia. Among those present at the meeting were Defendant Garry Drummond, Defendant Augusto Jimenez, Pedro Maya, a Human Resources Manager for Drummond, and Leonar Manrique, a company manager. In response to Garry Drummond's question to the assembled staff about how to deal with the "union problem," Jimenez, Maya, and Manrique advocated "getting rid of the union" through means necessary. Others at the meeting took the position that the union could be managed, but the campaign of violence against the union officially began at this meeting.

36. After the campaign of violence against trade union leaders at Drummond began, a number of Drummond managers at the La Loma mines, including John Ruddick (general foreman of the mines), Scotty Elmore (construction supervisor) and Ronny Hanley (safety supervisor) openly

characterized the SINTRAMIENERGETICA union and the left-wing guerillas as one and the same and openly accused this union as being responsible for the blowing up of the rail lines which was generally attributed to the guerillas. This same management openly stated that "the paramilitaries would take care of this problem" for them. In addition, key members of the Drummond Ltd. management -- including Defendant Augusto Jimenez; Ricardo Urbina Aroca, (Senior Human Resources supervisor) and Pedro Maya (Human Resources Manager at the La Loma mines) met with AUC leaders during the latter part of 2000 and through 2001, to arrange for the AUC to eradicate the union through violent means. In furtherance of this conspiracy, this management made payments to the AUC from the slush fund account mentioned above as consideration for the AUC's carrying out this violent destruction of the union.

37. Among the first victims of the Drummond campaign of terror were Locarno and Orcasita, President and Vice President, respectively, of the union. They had been in heated negotiations with Defendants for nearly a year for a new contract. In the course of the ongoing negotiations, pamphlets were passed out on and around the Drummond Company facilities in Colombia labeling SINTRAMIENERGETICA a "guerilla union," and attacking Locarno and Orcasita as supporters of the guerillas. In a letter to Drummond Ltd, Locarno specifically protested that the pamphlets described above had been distributed around the La Loma mine in the Cesar province of Colombia. He asked for security protection from the death threats he had been receiving. His request was denied by Drummond Ltd.'s Senior Human Resources supervisor, Ricardo Urbina Aroca by letter dated October 6, 2000. In rejecting this request without explanation, Ricardo Urbina Aroca told Locarno, on behalf of Drummond Ltd., that "[w]e hope that the authorities can take measures that they consider appropriate regarding the situations raised by you all."

38. There were two persistent issues that were the subject of heated negotiations between SINTRAMIENERGETICA and the Drummond Company. First, the union demanded better security to protect them from the paramilitaries who had been hired or retained by Defendants to protect the Drummond rail lines and other facilities from attacks by guerillas operating in the area. The other contentious issue was that in the prior year, several Drummond workers were killed in a mining accident, and the company had failed to pay the compensation due their families under the laws of Colombia. During these negotiations, the President of the La Loma mines, Defendant Augusto Jimenez, made veiled threats against the union leaders, telling them on several occasions that "the fish dies from opening his mouth."

39. Locarno met personally with Defendant Garry Drummond on the worker compensation issue on or about June 12, 2000, in Colombia. Locarno and Orcasita had also written and faxed to Garry Drummond personally their concerns that their lives, and the lives of other union leaders and members, were in danger due to the presence of the violent paramilitary forces that were agents of or employees of Defendants. They also specifically notified other officials of the Drummond Company and/or Drummond Ltd, including, but not limited to, Augusto Jimenez, President of Drummond Ltd, D.L. Lobb, General Manager of Drummond Ltd, and Mike Zerbos, an employee of Defendant Drummond Company, Inc, about their security concerns.

40. The concerns expressed by Locarno and Orcasita to Garry Drummond and other representatives of Defendants were based on recent assassinations, kidnappings and torture of other members and leaders of SINTRAMIENERGETICA. In the year prior to the murders of Locarno and Orcasita, Candido Mendez and Manuel Enrique Charris Ariza were also murdered by the paramilitaries. Locarno and Orcasita had made a very simple demand to be permitted to sleep at the

coal mine, rather than being transported to nearby villages by bus, where they were exposed to the paramilitaries who controlled the local roads. This request, made to Garry Drummond and other officials for Defendants, was denied even despite the fact that Colombia's secret service agency, the DAS, had alerted Drummond that Locarno and Orcasita were at high risk of assassination and despite the fact that the DAS itself echoed their request to be able to sleep at the coal mine.

41. Although Defendants flatly refused to improve security arrangements for the union leaders who had received specific death threats, Defendants made sure that the expatriate employees from the U.S. were never exposed to danger. At all times material hereto, these U.S. employees were flown in and out of the La Loma mines area by Drummond on a private runway and provided with a compound where they lived and were protected by the military and private security forces 24 hours a day, 7 days a week.

42. Shortly after they were threatened by Defendant Augusto Jimenez, Locarno and Orcasita were pulled off a Drummond company bus and murdered by paramilitaries of the AUC, some of whom were dressed in regular military uniforms. The paramilitaries boarded the bus and asked for Locarno and Orcasita by name, saying that these two "had a problem with Drummond." The paramilitaries made the workers produce their identification cards.

43. When Locarno was identified by the paramilitaries, he was pulled off the bus and shot in the head several times in front of the other workers. Orcasita was then identified. He was tied up and thrown in the paramilitaries' vehicle. He was found dead by the side of the road several hours later, shot in the head. He had been tortured before he was murdered. There were cuts on his chest, and his teeth had been knocked out.

44. Subsequent to the murders of Lacarno and Orcasita, their families received threats

to keep quiet about the murders. Many workers were afraid to return to the Drummond mine, and stayed away. The local office of SINTRAMIENERGETICA received threats from the paramilitaries to get back to work at Drummond. The murders of Locarno and Orcasita left the union paralyzed without its key leaders, and with others afraid to take leadership positions that would expose them to a substantial risk of assassination.

45. Gustavo Soler eventually stepped up to assume the position of President of the Union at the La Loma mine. He renewed negotiations with Drummond and specifically sought to obtain new security arrangements for the workers, especially in light of the murder of Locarno and Orcasita. He and the other leaders of SINTRAMIENERGETICA sent a letter to Defendant Garry Drummond renewing the demand to allow the workers to have sleeping facilities at the mine site. Again, this request was denied. In addition, Soler publicly denounced the murders of Locarno and Orcasita and publicly stated his belief that someone at the La Loma mines must have told the paramilitaries which specific bus was carrying them on the fateful night of March 12, 2001. Meanwhile, threats against Soler's life and the lives of other union leaders continued.

46. In late September, 2001, at a meeting of trade union leaders, including Plaintiff Aquas, Defendant Augusto Jimenez again made a threat that trade union leaders who caused trouble for the company would have a problem with the paramilitaries. On October 5, 2001, Soler was murdered by paramilitaries of the AUC.

47. Plaintiff Aquas held various positions in the Drummond union centered at the port where Drummond maintained a large facility to unload coal from the railroad and place it on barges for shipment. He joined the union on July 22, 1996, when it was formed, and served as President of the union at the port from 1996-97. He also served as the Secretary of Education, both at the port

union, and for the national office of SINTRAMIENERGETICA.

48. Plaintiff Aquas had been threatened with paramilitary violence on several occasions by Drummond management, and was present on at least one occasion in 2001 when Defendant Augusto Jimenez himself made the threat. In addition, in May 2002, after Plaintiff Aquas saw that his close colleagues and friends Locarno, Orcasita, and Soler could be murdered by paramilitaries with complete impunity, he was again present when the Drummond Superintendent of Rail Road operations threatened that "union leaders who make demands were wearing their own tombstones on their backs." He also learned that (Ret.) Colonel Edgar Ruis Garzon, a security officer for the Drummond Defendants, complied a list of trade union leaders who were viewed as problems by the company, and he gave the list to the paramilitaries working for Drummond.

49. In early October, 2002, Plaintiff Aquas was on his way to the union office. He saw two men on a motorcycle and two men on foot waiting near the entrance. He fled and called the DAS. He was informed by the intelligence officers at DAS that he was in fact now a target for assassination because of his union activities at Drummond. They informed him that there was little or nothing they could do to guarantee his safety if he continued working at Drummond. They offered to place him in the "internally displaced" category, and assist him to go into hiding. On October 11, 2002, Plaintiff Aquas officially went into hiding with assistance from the DAS.

50. No efforts were made by the government, following Plaintiff Aquas' complaints, to arrest any employee or agent of Drummond, or any paramilitary member. As in most other cases, the government officials viewed any such effort as futile, and offered refuge rather than law enforcement to Plaintiff Aquas.

## VI. DEFENDANTS' VIOLATIONS OF LAW

51. Defendants' actions violate, and Aquas's causes of action arise from, the following laws, agreements, conventions, resolutions and treaties, which constitute specific examples of the applicable law of nations or customary international law

(a) Alien Tort Claims Act, 28 U.S.C. § 1350;

(b) Torture Victim Protection Act, 28 U.S.C. § 1350;

(c) Common law of the United States of America;

(d) United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

(e) Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

(f) International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

(g) Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984)(ratified 10/28/98);

(h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

(i) Vienna Declaration and Programme of Action (World Conference on Human Rights, 1993);

(j) International Labor Organization Conventions 87 and 98, which protect the fundamental rights to associate and organize;

(k) Article 3 of the Geneva Conventions; and

(l) Statutes and common law of the State of Alabama, including but not limited to, intentional infliction of emotional distress, assault, and negligence.

## VII. CAUSES OF ACTION

### First Cause of Action
**The Alien Tort Claims Act, 28 U.S.C. § 1350**
**For Torture**

52. Aquas incorporates by reference paragraphs 1 through 53 of this Complaint as set forth herein.

53. Defendants Drummond Company, Inc., Drummond Ltd., Garry Drummond and Augusto Jimenez engaged in acts and/or omissions of intentionally and tortiously causing their employees and/or agents to torture Plaintiff Aquas. Specifically, as is alleged above, the Defendant companies' employees and/or agents, including Defendant Augusto Jimenez, Pedro Maya, and Ricardo Urbina engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of law, and, so acting, tortured Plaintiff Aquas. Further, through their employees and/or agents, including Defendant Augusto Jimenez, Pedro Maya, and Ricardo Urbina, the Defendant companies knowingly aided and abetted the paramilitary forces that tortured Plaintiff Aquas by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to torture Plaintiff Aquas.

54. Defendant Garry Drummond was aware of the relationship between the Drummond companies and the paramilitaries and the threats posed by the paramilitaries to the unionists at the Drummond facilities. After the murders of Locarno, Orcasita and Soler, no action was taken to provide security for the remaining union leaders, and no action was taken to terminate the

relationship between Drummond and the AUC paramilitaries. However, while having the requisite control to do so, he recklessly failed to do anything to cease this relationship or to otherwise protect Plaintiff Aquas.

55. Defendants realized substantial benefits from the torture of Plaintiff Aquas that forced him into hiding, including the de-stabilization of SINTRAMIENERGETICA and the avoidance of financial obligations to members of the union. As noted by the ICFTU, the "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001" (ICFTU Report at p. 81). The violence directed by Defendants against members of Plaintiff SINTRAMIENERGETICA has caused specific damage to the union's continued viability, mission, interests, and has inflicted financial damage. SINTRAMIENERGETICA has been forced to use scarce resources to investigate threats to members and leaders, and to provide security and protection to those under threat.

56. The aforesaid acts violate the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra*. The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary security forces in the Cesar Province on the Drummond property are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents or other state government officials, Defendants acted under color of law in violating each of

the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra.* Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

57. Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra,* resulted in the torture of Plaintiff Aquas. Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra.* Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra.* Plaintiff Aquas seek compensatory and punitive damages in amounts to be ascertained at trial. Plaintiff Aquas further seek equitable relief to prevent further human rights violations.

**<u>Second Cause of Action</u>**
**The Torture Victim Protection Act, 28 U.S.C. § 1350**

58. Aquas incorporates by reference paragraphs 1 through 57 of this Complaint as is set forth herein.

59. Defendants Drummond Company, Inc., Drummond Ltd., Garry Drummond and Augusto Jimenez engaged in acts and/or omissions of intentionally and tortiously causing their employees and/or agents to torture Plaintiff Aquas. Specifically, as is alleged above, the Defendant

companies' employees and/or agents, including Defendant Augusto Jimenez, Pedro Maya, and Ricardo Urbina engaged in joint action with, and/or conspired with, paramilitary forces that were operating under color of law, and, so acting, tortured Plaintiff Aquas. Further, through their employees and/or agents, including Defendant Augusto Jimenez, Pedro Maya, and Ricardo Urbina, the Defendant companies knowingly aided and abetted the paramilitary forces that tortured Plaintiff Aquas by providing financial support, supplies, access, and other substantial assistance that contributed to the ability of the paramilitary forces to torture Plaintiff Aquas.

60. Defendant Garry Drummond was aware of the relationship between the Drummond companies and the paramilitaries and the threats posed by the paramilitaries to the unionists at the Drummond facilities. After the murders of Locarno, Orcasita and Soler, no action was taken to provide security for the remaining union leaders, and no action as taken to terminate the business relationship between Drummond and the AUC paramilitaries. However, while having the requisite control to do so, he recklessly failed to do anything to cease this relationship or to otherwise protect Plaintiff Aquas.

61. Defendants realized substantial benefits from the torture of Plaintiff Aquas that forced him into hiding, including the de-stabilization of SINTRAMIENERGETICA and the avoidance of financial obligations to members of the union. As noted by the ICFTU, the "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001" (ICFTU Report at p. 81).

62. The aforesaid acts violate the law of nations, customary international law, and

worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra*. The acts described herein are actionable under the TVPA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary security forces in the Cesar Province on the Drummond property are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents or other state government officials, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra*. Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

63. Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 53, *supra,* resulted in the torture of Plaintiff Aquas. Defendants are jointly and severally liable for the acts of any and all subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra*. Defendants are also vicariously liable for any violations of their employees or agents of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra*. Plaintiff Aquas seeks compensatory and punitive damages in amounts to be ascertained at trial. Aquas further seeks equitable relief to prevent further human rights violations.

**Third Cause of Action**
**The Alien Tort Claims Act, 28 U.S.C. § 1350**
**For Denial of Fundamental Rights to Associate and Organize**

64. Aquas incorporates by reference paragraphs 1 through 63 of this Complaint as is set forth herein.

65. Defendants committed, or acted in concert to commit, or Defendants' co-venturers or agents committed, violent acts against and tortured Plaintiff Aquas, and others, as is described fully in the preceding paragraphs. This violence was intentionally designed and carried out to deny Plaintiff Auas, and his colleagues in SINTRAMIENERGETICA, their fundamental rights to associate and organize, and did in fact result in the denial of these rights. Defendant Garry Drummond was aware of the relationship between the Drummond companies and the paramilitaries and the threats posed by the paramilitaries to the unionists at the Drummond facilities. After the murders of Locarno, Orcasita and Soler, no action was taken to provide security for the remaining union leaders, and no action as taken to terminate the business relationship between Drummond and the AUC paramilitaries. However, while having the requisite control to do so, he recklessly failed to do anything to cease this relationship or to otherwise protect Plaintiff Aquas.

66. Defendants realized substantial benefits from the torture of Plaintiff Aquas that forced him into hiding, including the de-stabilization of SINTRAMIENERGETICA and the avoidance of financial obligations to members of the union. As noted by the ICFTU, the "[t]rade union activists affiliated to the Union of Workers of the Mining and Energy Industry of Colombia [SINTRAMIENERGETICA] and working at mines run by the US multinational Drummond have been particularly severely affected by the violence that occurred throughout 2001" (ICFTU Report at p. 81),

67. The acts described herein constitute violations of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 53, *supra.* The acts described herein are actionable under the ATCA, and, if such a showing is required, were done with the complicity of state actors. The paramilitary forces of the Cesar Province that were based at the Drummond facilities are permitted to exist, openly operate under the laws of Colombia, and are assisted by government military officials. In engaging in joint action and/or a conspiracy with such paramilitary agents and/or other state government entities, Defendants acted under color of law in violating each of the applicable laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra.* Further, the Government of Colombia fails to enforce its laws that would prevent or remedy the violations alleged herein.

68. Defendants' conduct in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra,* resulted in the torture and exile of Plaintiff Aquas, and has caused significant injury to SINTRAMIENERGETICA, which has lost significant membership because of death threats directed against, and the murders of, leaders of local unions.

69. Defendants are jointly and severally liable for the acts of any subsidiaries that are in violation of the law of nations, customary international law, and worldwide industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra.* Defendants are also vicariously liable for any violations of their employees and/or agents of the law of nations, customary international law, and worldwide

industry standards and practices, including, but not limited to, the specific laws, agreements, conventions, resolutions and treaties listed in paragraph 51, *supra*. Mr. Aquas is entitled to injunctive relief and to recover compensatory and punitive damages in amounts to be ascertained at trial.

**<u>Fourth Cause of Action</u>**
**Assault**

70. Aquas incorporates by reference paragraphs 1 through 69 of this Complaint as is set forth herein.

71. Defendants committed, or acted in concert to commit, or Defendants' employees or agents, committed acts that constitute assault under the laws of the State of Alabama, the laws of the United States and the laws of Colombia, and that caused the immediate threat of bodily harm to Plaintiff Aquas. Defendants Garry Drummond Augusto Jimenez were aware of the relationship between the Drummond companies and the paramilitaries and the threats posed by the paramilitaries to the unionists at the Drummond facilities, including Plaintiff Aquas. However, while having the requisite control to do so, they recklessly failed to do anything to cease this relationship or to otherwise protect Plaintiff Aquas, who seeks damages herein for the injuries suffered due to the concrete threats to his life.

72. Defendants' actions and omissions were a direct and substantial cause of the assaults to Plaintiff Aquas. Defendants failed to use due care to protect him from injury and harm, thereby proximately causing his injuries. Plaintiff Aquas is entitled to recover compensatory and punitive damages in amounts to be ascertained at trial.

**<u>Fifth Cause of Action</u>**
**Intentional Infliction of Emotional Distress**

73. Aquas incorporates by reference paragraphs 1 through 72 of this Complaint as is set forth herein.

74. The acts described herein constitute outrageous conduct against Plaintiff Aquas and were without privilege.

75. Defendants committed, or acted in concert to commit, or Defendants' co-venturers or agents committed acts, which were intended to cause Plaintiff Aquas to suffer emotional distress. In the alternative, Defendants engaged in the conduct with reckless disregard of the probability of causing Plaintiff to suffer emotional distress. Plaintiff was present at the time the outrageous conduct occurred, and Defendants, or Defendants' alter egos or agents, knew that the Plaintiff was present.

76. Plaintiff suffered severe emotional distress and the outrageous conduct of Defendants was a cause of the emotional distress suffered by Plaintiff.

77. Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of the State of Alabama, and the laws of the United States.

**<u>Sixth Cause of Action</u>**
**Negligent Infliction of Emotional Distress**

78. Aquas incorporates by reference paragraphs 1 through 77 of this Complaint as is set forth herein.

79. At all relevant times, Defendants owed Plaintiff Aquas a duty to act with reasonable care, and at all relevant times, harm and/or injury to him was reasonably foreseeable if such duty of care was breached.

80. At all relevant times, Defendants had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

81. At all relevant times, Defendants knew, or reasonably should have known, that the conduct described herein would and did proximately result in physical and emotional distress to Plaintiff Aquas.

82. Despite said knowledge, power, and duty, Defendants, and each of them, breached their duty to Plaintiff Aquas, and thereby negligently failed to act so as to stop engaging in the conduct described herein and to prevent or to prohibit such conduct or to otherwise protect Plaintiff Aquas. To the extent that said negligent conduct was perpetrated by certain Defendants, and each of them, the remaining Defendants confirmed and ratified said conduct with the knowledge that Plaintiff's emotional and physical distress would thereby increase and with a wanton and reckless disregard for the deleterious consequences to him.

83. As a direct and legal result of Defendants' wrongful acts, Plaintiff Aquas suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

84. Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of the State of Alabama, and the laws of the United States.

**<u>Seventh Cause of Action</u>**
**Negligent supervision of employees/agents**

85. Plaintiff Aquas incorporates by refenence and restates the factual allegations in the preceding paragraphs

86. The Defendants owed a duty to the plaintiff to supervise its employee/agents. The defendants negligently failed to supervise the activities of their employee/agents.

87. As a result of such negligent supervision, the plaintiff Aquas was injured.

## VIII. DEMAND FOR JURY TRIAL

88. Aquas demands a trial by jury on all issues so triable.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Aquas respectfully requests the Court to:

(a) enter judgment in favor of Aquas on all counts of the Complaint;

(b) declare that Defendants have violated Aquas' human rights and the laws of the State of Alabama and the United States, as set forth herein;

©) award Aquas compensatory and punitive damages;

(d) grant Aquas equitable relief, permanently enjoining Defendants from further engaging in human rights abuses against Aquas and other members of SINTRAMIENERGETICA;

(e) award Aquas the costs of suit including reasonable attorneys' fees;

(f) award Aquas such other and further relief as the Court deems just under the circumstances.

Respectfully submitted this 5th day of March, 2003,

ATTORNEYS FOR AQUAS

Dan Kovalik (By RPR)

Daniel M Kovalik
PA Bar No. 69065
UNITED STEELWORKERS
OF AMERICA, AFL-CIO/CLC
Five Gateway Center
Pittsburgh, Pa. 15222
Phone: (412) 562-2518
Fax: (412) 562-2574

Terry Collingsworth (By RPR)

Terry Collingsworth
DC Bar No. 471830
Natacha Thys
DC Bar No. 458143
INTERNATIONAL LABOR
RIGHTS FUND
733 15th Street N.W., Suite 920
Washington, D.C. 20005
Phone: (202) 347-4100
Fax: (202) 347-4885

LOCAL COUNSEL FOR AQUAS:

Richard Rouco

Richard Rouco
WHATLEY DRAKE, LLC
2323 Second Avenue, North
Birmingham, AL 35203
Phone: (205) 328-9576
Fax: (205) 328-9669